IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| JAMES ROY DENT, | : | |
|     Plaintiff, | : | |
| vs. | : | 5:07-CV-13 (CAR) |
| MEDICAL CENTER OF CENTRAL GEORGIA; RAFAEL J. GAYTON, M.D.; MACON ELECTROPHYSIOLOGY ASSOCIATES, P.C.; ZOE JONES, M.D.; and CENTRAL GEORGIA HEART CENTER, P.C. | : | |
|     Defendants. | : | |

*ORDER ON MOTIONS FOR SUMMARY JUDGMENT*

Before the Court are Defendants' Motions for Summary Judgment [Docs. 47, 48, and 49]. Plaintiff, proceeding *pro se*, filed Responses [Docs. 61, 62, 63, and 69] to the Motions.[1] For the reasons stated below, Defendants' Motions for Summary Judgment are **GRANTED**. Thus, all remaining pending motions, including Plaintiff's Motion for Federal Forensic Associates, Inc. to Examine Medical Document [Doc. 38], and Defendant Medical Center of Central Georgia's Motion to Suspend Briefing by Parties Without Leave of Court [Doc. 75] are **MOOT**.

**BACKGROUND**

Plaintiff James Roy Dent, brings this medical malpractice, wrongful death action against Defendants Medical Center of Central Georgia ("Medical Center"); Rafael J. Gaytan, M.D.; Macon Electrophysiology Associates, P.C. ("Macon Electrophysiology"); Zoey Jones, M.D.; and the

---

[1] Plaintiff's Motion to Amend Complaint [Doc. 37] and Motion to Amend his Responses to each of the Motions for Summary Judgment [Doc. 69] are hereby **GRANTED**.

Central Georgia Heart Center ("Heart Center"). Plaintiff alleges that Defendants' jointly and severally caused the death of his son, James Mark Dent ("Mark Dent"). The facts relied upon by the Court in arriving at its decision, taken in the light most favorable to Plaintiff, are as follows:

Mark Dent, a thirty-four year old mentally challenged adult who resided with his parents, Roy (Plaintiff) and Ruth Dent, in Byron, Georgia, died in his parents' home approximately seven hours after leaving the Emergency Center of the Medical Center of Central Georgia ("Emergency Center") on January 14, 2005.

Mark had a long history of physical ailments beginning at birth, and, prior to his death, he had been diagnosed with end-stage renal disease. Mark had been told that without a kidney transplant he would require dialysis for the rest of his life. According to his mother, Mark had "the knowledge of fourth or fifth grader," and his parents made medical decisions on his behalf.

In the month preceding his death, Mark was seen at the Emergency Center on two occasions. The first occurred on December 22, 2004, after Mark experienced an elevated heart rate during dialysis at another facility. After being evaluated, Mark was discharged to his parents' care with instructions to follow up with his nephrologist, Dr. Ludwig Cavaliere, in two to three days, and to return to the Emergency Center if his condition worsened or new problems arose.

Two days later, on December 24, 2004, Mark returned to the Emergency Center for evaluation of his high blood pressure and elevated heart rate. After evaluation, Mark was admitted for further observation and remained as an inpatient in the hospital for a week, until he was released on December 31, 2004. On December 27, 2004, Defendant Dr. Zoe Jones, a cardiologist, examined Mark and noted that a prior EKG revealed atrial fibrillation with rapid ventricular rate. Mark was also examined by Defendant Dr. Rafael Gaytan for a cardiac consultation. Dr. Gaytan noted that

Mark had more arrhythmias, including a three-beat run of non-sustained ventricular tachycardia and ventricular bigeminy. During Mark's hospitalization, Dr. Jones told Mark's parents that Mark would need to wear a Holter monitor, and emphasized the need for Mark to wear the monitor. Dr. Jones told Mark's parents to make an appointment with her office for Monday, January 3, 2005, which was the Monday immediately following his discharge on Friday, December 31, 2004.

Mark, however, was unable to be fitted for the Holter monitor on that Monday because he was having problems at dialysis. On Tuesday, January 4, Mark underwent an arteriovenous graftogram at the Medical Center on an outpatient basis. Two days later, on Thursday, January 6, 2005, Mark was fitted for the Holter monitor at the Heart Center. Mark wore the Holter monitor overnight and to dialysis on Friday, January 7, 2005, before it was removed that afternoon. Mr. Dent, who accompanied Mark to both Holter monitor appointments, said that an employee told him if the monitor showed any abnormalities, he would be contacted within twenty-four hours; if he was not contacted, then the monitor would not have shown anything "that would hurt Mark."

Seven days later, on Friday, January 14, 2005, at approximately 2:00 to 2:30 p.m., Mr. Dent received a telephone call from someone identified as working at the Holter monitor office instructing him to rush Mark to the emergency room. Mr. Dent tried to obtain the specific reasons why he needed to rush his son to the emergency room, but the person on the phone would not tell him why. Mr. Dent became upset because he could not understand why it had taken seven days for him to be contacted about the Holter monitor results. Mr. Dent told the person on the phone that he would have to pick his wife up from work before taking Mark to the ER, and that person said okay, but explained that Mark needed to get to the emergency room.

Mr. Dent then prepared Mark for what he believed would be at least an overnight stay in the

3

hospital. He gave Mark a bath, and had Mark pack his things. At approximately 4:30 p.m., Mr. Dent picked up his wife from her place of employment. They then returned home to make further preparations for a hospital stay and to pick up Mark. At approximately 5:15 p.m., three hours after receiving the phone call instructing Mr. Dent to take Mark to the emergency room, the Dents departed for the emergency room.

Mr. and Mrs. Dent state that the hospital records showing that they did not arrive at the Emergency Center until 6:40 p.m., are wrong. The Dents state they actually arrived at the Emergency Center between 5:30 p.m. and 6:00 p.m. Shortly after the Dents arrived, Mark was triaged by an Emergency Center staff member to determine how critical his condition was. As part of the triage process, the staff member took Mark's blood pressure and vital signs. Mark's vital signs were all normal. Mr. Dent then told the staff member that he had been instructed to rush Mark to the hospital due to certain readings on his Holter monitor. However, because the individual who spoke to Mr. Dent on the telephone refused to inform him about the specific monitor readings, Mr. Dent could not inform the nurses the reasons why they were told to rush Mark to the emergency room. Based on this information, Mark was taken to an enclosed area with two nurses. After Mr. Dent inquired about the existence of any doctor's orders or other instructions regarding Mark's condition, one of the nurses told Mr. Dent that no doctor had called in any orders or informed anyone in the emergency room about Mark's condition or the reasons why Mark was instructed to be rushed to the ER. One of the nurses told Mr. Dent that Mark could not be admitted without a doctor's orders.

Because no doctor had called in any orders regarding Mark, Mr. Dent, with the assistance of hospital staff, attempted to reach one of Mark's physicians. Despite their attempts, the Dents

were unable to contact Dr. Jones and Dr. Gaytan.  The Dents asked the nurses to pull up Mark's medical records from his hospitalization two weeks earlier, which they informed the nurses would alert them to Mark's heart problems, but the nurses would not do so.  Thus, Mr. Dent told the nurses to call Dr. Cavalier, Mark's nephrologist, Dr. Cavalier.  Dr. Cavalier had seen Mark that morning for dialysis.

At 6:45 p.m., one of the nurses paged Dr. Cavalier, and Mr. Dent spoke to him.  Dr. Cavalier told Mr. Dent that Mark's vital signs had been in "good shape" when he saw him that morning, and he "could not understand" why the Dents were at the emergency room.  Dr. Cavalier's comments left the Dents with the impression that it was okay for them to leave the emergency room.  A nurse also had explained to Mark's parents that an emergency room physician would not be able to admit Mark as an inpatient to the Medical Center; a private physician would have to admit him.  Mr. Dent also testified that a nurse told him he could wait all day, all night, and tomorrow, and still not get to see a doctor, essentially implying that no doctor was available to see them in the emergency room.  Moreover, Mark was getting hungry.  Based on these factors, the Dents jointly made the decision to leave the emergency room and go home.  Mark left the emergency room without treatment at 7:10 p.m. on January 14, 2005.

After leaving the emergency room, Mark and his parents had dinner at a local restaurant and then went home.  Once home, Mark went to sleep around 10:30 or 11:00 p.m.  Around 2:00 a.m. on January 15, 2005, Mrs. Dent heard Mark making noises, as if he were having trouble breathing.  Mark died around this time in his parent's home.

### STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment must be granted if "there is no genuine issue as to any material fact and

. . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered where

"the nonmoving party has failed to make a sufficient showing on an essential element of [her] case with respect to which [she] has the burden of proof."  Celotex, 477 U.S. at 323.

## DISCUSSION

In a diversity action, such as this one, liability is determined in accordance with the law of the state where the alleged wrong occurred.  See 28 U.S.C. § 1332; Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Here, because the alleged malpractice occurred in Georgia, Georgia law controls.  In order to establish a medical malpractice claim in Georgia, a plaintiff must establish three elements: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained."  Knight v. West Paces Ferry Hosp., Inc., 262 Ga. App. 220, 221 (2003).  Because Plaintiff fails to establish that any Defendant breached the requisite standard care and that said breach caused Plaintiff's damages, Defendants are entitled to judgment as a matter of law.

First, Plaintiff fails to establish that any Defendant breached the applicable standard of care in treating his son because he fails to present any expert medical testimony.  Under Georgia law, a "person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill."  O.C.G.A. § 51-1-27 (2006).  "Any injury resulting from want of such care and skill shall be a tort for which a recovery may be had."  Id.  The law presumes that medical services provided to a patient "were performed in an ordinary, skillful manner."  Beach v. Lipham, 276 Ga. 302, 304 (2003): Evans v. Dekalb County Hosp. Auth., 154 Ga. App. 17, 20 (1980).  This presumption, which is rebuttable, "is a legal inference or assumption that physicians, nurses, and other medical professionals

exercise due care and skill in their treatment of a patient based on their education, training, and experience." Beach, 276 Ga. at 304.  In order to rebut that presumption, a plaintiff must introduce evidence that the defendant did not treat plaintiff in an "ordinarily skillful manner."  Id. at 305-06.  Expert medical testimony is required to overcome that presumption.  Id.  "A plaintiff may not rely on his own statements and lay opinions to avoid summary judgment."  Suggs v. United States, 199 Fed. Appx. 804, 808 (11th Cir. 2006) (citing Parker v. Knight, 245 Ga. 782 (1980); Lawrence v. Gardner, 154 Ga. App. 722 (1980)).

Here, Plaintiff has failed to identify or present any expert testimony that any Defendant, or any agent or employee of any Defendant, violated the applicable standard of care.  Plaintiff merely relies on his own lay opinion, arguing that each Defendant breached their requisite standards of care in the following ways: (1) the staff at Defendant Medical Center failed to properly triage Mark upon Mark's arrival at the Emergency Center; (2) Defendant Dr. Zoe Jones and the staff of Defendant Heart Center violated medical standards in their treatment of Mark; and (3) Defendant Dr. Rafael Gaytan and the employees of Defendant Macon Electrophysiology failed to timely contact the Dents regarding Mark's Holter Monitor results and failed to notify the Emergency Center of Mark's heart condition.  Plaintiff's arguments, however are merely conclusory.  He has not provided the medical expert testimony required to overcome the presumption that the Defendants and their employees exercised due care in treating Mark.

Moreover, each Defendant has presented their own expert testimony establishing that they met or exceeded the requisite standard of care in treating Mark.  Specifically, Todd Albinger, M.D., a board certified emergency room physician since 1994, who has worked continuously, on a full-time basis, as an emergency room physician at St. Josheph's Hospital in

Atlanta, Georgia since 1999, gave his expert opinion that the Emergency Center and staff at Defendant Medical Center met the standard of care in triaging Mark on January 14, 2005. Likewise, Mark Dorogy, M.D., a cardiologist, board certified in cardiovascular diseases and internal medicine since 1993, and Darrell Collins, D.O., a doctor of osteopathic medicine who completed a cardiology fellowship at Indiana University and has worked continuously in cardiology since 1999, gave their expert opinions that Defendants Dr. Zoe Jones and the Heart Center exercised due care in their treatment of Mark.  Finally, Gary W. Olson, M.D., a cardiologist, gave his expert opinion that Defendants Dr. Gaytan and the employees of Macon Electrophysiology also fully complied with the requisite standard of care in treating Mark Dent.

Not only does Plaintiff fail to establish a genuine issue of material fact as to whether any of the Defendants breached the applicable standard of care, but he also fails to establish an issue of fact regarding how any Defendant proximately caused the death of his son.  As stated above, Plaintiff must prove that the breach of the standard of care was the proximate cause of the injury sustained.  The Georgia Court of Appeals has recently reaffirmed that

> [t]o establish the proximate cause required in a medical malpractice action, the plaintiff must use expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson.  Using the specialized knowledge and training of his field, the expert's role is to present to the jury a realistic assessment of the likelihood that the defendant's alleged negligence caused the plaintiff's injury.

Allen v. Family Medical Center, P.C., — S.E.2d —, 2007 WL 2631882 , *2 (Ga. Ct. App., Sept. 12, 2007).  Again, Plaintiff has failed to identify any expert witness who will testify that an act or omission of any Defendant or agent or employee of any Defendant proximately caused his son's death.  Thus, all Defendants are entitled to judgment as a matter of law.

## CONCLUSION

Because Plaintiff is unable to point to an issue of fact regarding either standard of care or proximate cause, Defendants' Motion for Summary Judgment [Doc. 47, 48, and 49] are **GRANTED**.  With the exception of Plaintiff's Motion to Amend Complaint [Doc. 37] and Motion to Amend his Responses to each of the Motions for Summary Judgment [Doc. 69], which are **GRANTED**, all remaining pending motions, including Plaintiff's Motion for Federal Forensic Associates, inc. to Examine Medical Document [Doc. 38], and Defendant Medical Center of Central Georgia's Motion to Suspend Briefing by Parties without Leave of Court [doc. 75] are **MOOT**.

**SO ORDERED,** this 19th day of December, 2007.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

SSH/scs